UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ARKANSAS OKLAHOMA GAS
CORPORATION                                                                                              PLAINTIFF

v.                                        No. 2:21-CV-02073

BP ENERGY COMPANY                                                                                    DEFENDANT

**OPINION AND ORDER**

Before the Court are Defendant BP Energy Company's ("BP") motion to compel (Doc. 54) and brief in support (Doc. 55), as well as Plaintiff Arkansas Oklahoma Gas Corporation's ("AOG") response in opposition (Doc. 60), and BP's reply in further support (Doc. 66).[1]  For the reasons given below, an evidentiary hearing on this motion will be set by separate order.

**I.      Background**

AOG is a utility company that provides natural gas to roughly 60,000 customers in Arkansas and Oklahoma.  BP supplies natural gas to AOG under a contract between the parties ("the Contract").  According to AOG, during the relevant period the Contract required BP to provide AOG with up to 30,000 MMBtu[2] of natural gas per day, on demand, at a specified price—for which AOG paid BP a monthly "demand charge" as consideration.  *See* Doc. 50, ¶¶ 6–9.

This lawsuit arises from events that occurred during the week of February 15 through February 19, 2021.  Essentially, AOG alleges that on each of these five days, it sought 30,000 MMBtu of natural gas from BP, but that during this period BP only provided a total of 30,950

---

[1] Many of these documents were filed under seal pursuant to a stipulated protective order (Doc. 36) and an order (Doc. 53) granting a motion for leave to file under seal (Doc. 52).

[2] One MMBtu is equal to one million British Thermal Units.  One British thermal unit is the amount of heat necessary to raise the temperature of one pound of water by one degree Fahrenheit.

1

MMBtu—which was 119,050 MMBtu short of the total 150,000 units that AOG requested. *See id.* at ¶¶ 10–19. AOG claims that it spent $34,401,735.25 covering this shortfall by purchasing natural gas from other providers. *See id.* On March 12, 2021, AOG invoiced BP for damages in that amount, arguing that BP was obligated under the Contract to compensate AOG for these expenditures. *See id.* at ¶¶ 20–21. Five days later, BP sent AOG a "Notice of Force Majeure," contending that "extreme weather conditions and historic freezing temperatures" excused BP from its obligations under the Contract during the period at issue. *See id.* at ¶¶ 22–24. AOG filed this lawsuit on March 29, 2021. Its operative complaint asserts two counts against BP: one for breach of contract and one for unjust enrichment. *See id.* at ¶¶ 25–34.

A couple of disputes have arisen between the parties regarding the scope of discovery. On March 16, 2022, BP took AOG's Rule 30(b)(6) deposition. AOG's corporate representative for this deposition was Walt McCarter, manager of gas supply and contracting at Summit Utilities ("Summit"), which is a parent company of AOG. *See* Doc. 55-2, p. 4 (internally numbered 7:2–9:7). Mr. McCarter testified in this deposition that he had been Summit's "point of contact for Ozark pipeline"[3] throughout the week of February 15 through 19, and that during this period he created a "handwritten memo or notes" to "memorialize the conversations we were having not only with AOG but with our other utilities and suppliers and pipelines." *See id.* at 8 (internally numbered 294:6–295:20). BP then sought production of these materials, which AOG refused to produce on the grounds that they were protected by the work product doctrine.[4] Additionally, BP

---

[3] "Ozark pipeline" here refers to the Ozark Gas Transmission L.L.C. pipeline, on which BP contends no natural gas was available for purchase "during the worst days of" Winter Storm Uri in February 2021. *See* Doc. 55, p. 5.

[4] BP claims that AOG initially relied not only on the work product doctrine but also on the attorney client privilege. *See* Doc. 55, p. 7. However, AOG insists that it "has not claimed that

has asked AOG to revise its privilege log in order to provide more details or context about documents responsive to BP's discovery requests that are being withheld on the basis of the attorney client privilege or work product doctrine. AOG has agreed to provide a revised privilege log, but apparently has not yet followed through on that promise. *See* Doc. 55, pp. 9–10 & n.1; Doc. 60, p. 7.

## II.  Legal Standard

Under the Federal Rules, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Importantly, "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* Federal district courts are vested with very wide discretion in determining the scope of discovery. *See, e.g.*, *Gov't of Ghana v. ProEnergy Servs., LLC*, 677 F.3d 340, 344 (8th Cir. 2012) (observing that "appellate review of a district court's discovery rulings is both narrow and deferential," and that a district court's discovery ruling will not be reversed "absent a gross abuse of discretion resulting in fundamental unfairness in the trial of the case" (internal alterations and quotation marks omitted)).

However, parties generally may not use discovery to obtain attorney work product unless certain conditions are satisfied. The work product doctrine recognizes two types of work product: "ordinary" work product and "opinion" work product. The former contains "raw factual information," while the latter "includes counsel's mental impressions, conclusions, opinions, or legal theories." *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000). Opinion work product "enjoys almost absolute immunity and can be discovered only in very rare and

---

the attorney-client privilege is involved." *See* Doc. 60, p. 4 n.2. Accordingly, this opinion and order will not conduct any attorney client privilege analysis.

extraordinary circumstances, such as when the material demonstrates that an attorney engaged in illegal conduct or fraud." *Id.*

In contrast, although ordinary work product also enjoys protection, it is discoverable under broader circumstances than opinion work product. This doctrine is codified in the Federal Rules of Civil Procedure, which provide that:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3)(A).

In the Eighth Circuit, when determining whether a document was prepared in anticipation of litigation,

> The test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.

*Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987) (quoting 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2024, at 198–199 (1970)) (cleaned up). Importantly, "[w]hile the 'work product' may be, and often is, that of an attorney, the concept of 'work product' is not confined to information or materials gathered or assembled by a lawyer." *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 603 (8th Cir. 1977).

Although, as noted above, a party seeking to obtain work product bears the burden of showing a "substantial need" for those materials and that obtaining them elsewhere would involve "undue hardship," the party invoking the work product doctrine bears the initial burden of

4

establishing that the materials in question constitute work product in the first place. *See In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 925 (8th Cir. 1997). An important step in meeting that burden is the production of what is commonly referred to as a "privilege log." Under the Federal Rules:

> When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5)(A).

A detailed privilege log that states "the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit," may suffice to meet the resisting party's initial burden of showing that the materials in question are work product. *See Rabushka ex rel. U.S. v. Crane Co.*, 122 F.3d 559, 565 (8th Cir. 1997). On the other hand, "[a] party's delay or outright failure to provide a privilege log can waive the privilege, but does not waive it automatically." *RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, 489 F. Supp. 3d 907, 914 (W.D. Mo. 2020) (citing *Isham v. Booneville Cmty. Hosp.*, No. 2:14-CV-02018, 2015 WL 11117159, at *3 (W.D. Ark. Apr. 23, 2015)). Similarly, a privilege log that provides insufficient information to enable other parties or the court to assess the claim may also result in a waiver of the privilege; but this too is not a *per se* rule. *See, e.g., Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005). "Waiver of the privilege is reserved as a serious sanction 'for cases of unjustified delay, inexcusable conduct, and bad faith.'" *RightCHOICE*, 489 F. Supp. 3d at 914 (quoting *United States v. Philip Morris Inc.*, 347 F.3d 951, 954 (D.C. Cir. 2003)).

**III.   Discussion**

As mentioned above, the documents at issue here are notes that Mr. McCarter took during or around the week of February 15 through 19, 2021, memorializing conversations he had with AOG and other utilities, suppliers, and pipelines, relating to Winter Storm Uri's impact on natural gas supplies. As a threshold matter, the Court finds that these materials are relevant to the claims and defenses in this case, and that they are responsive to BP's discovery requests. AOG does not appear to contest these documents' relevance or responsiveness, but in the interest of clarity and thoroughness the Court will very briefly explain the basis for this ruling.

First, with respect to relevance: these documents are relevant to the questions of, among other things, whether and to what extent AOG purchased "cover gas" to replace BP's shortfall, and whether and to what extent BP was able to transport natural gas to AOG on the Ozark pipeline. The former question is relevant to the issue of damages, and the latter question is relevant to BP's asserted defenses of force majeure, impossibility, and impracticability. Second, with respect to responsiveness: as BP correctly notes in its opening brief, these documents are directly responsive to requests for production that BP propounded on AOG seeking documents and communications concerning, among other things, AOG's "solicitation or purchase of natural gas from entities other than BP" during the week in question, AOG's purchases of replacement natural gas during the relevant period, and restrictions placed on the Ozark pipeline during the relevant period, as well as "[a]ll communications with the Ozark Pipeline" during the relevant period. *See* Doc. 55-1, pp. 4–5, 7–8 (RFP Nos. 4–9, 15, 17).

Turning now to the issue of whether these documents are privileged or otherwise protected from discovery: the record is insufficiently developed for the Court to make a finding on whether

these materials are work product. Therefore, the Court will set this matter for an evidentiary hearing.

AOG bears the initial burden of showing that these materials are work product. As previously noted, one way of carrying that burden can be through the production of a detailed privilege log.

However, AOG's privilege log does not provide a sufficient level of detail to allow BP or this Court to assess AOG's claim that these materials are work product. The log entry associated with Mr. McCarter's notes, PRIV000339, simply provides the following description of a document dated "3/11/2021" sent from "Walt McCarter" to "William Hewitt" with "Brooke South" copied: "Email chain with attachment(s) providing legal advice re: litigation prepared in anticipation of litigation." *See* Doc. 55-7, p. 35. There are several problems here. One is that the document date of March 11 is not consistent with the February date range when Mr. McCarter testified he created the notes at issue. Another is that the description is ambiguous as to whether the email chain, the attachment(s), or both contain legal advice. Relatedly, it is not clear from the privilege log whether the notes in question are an attachment to the email chain or embedded in the body of the email chain itself, nor whether the notes themselves contain legal advice, nor why the notes cannot be produced independently of the email chain.[5]

But a privilege log is not the only means by which a party claiming work product protection may carry its initial burden. Looking beyond the privilege log, AOG has offered evidence that

---

[5] The Court does *not* find that AOG's privilege log is so deficient as to result in an outright waiver of work product protection. As noted above, a finding of waiver would require a finding of unjustified delay, inexcusable conduct, or bad faith on the part of AOG. The record does not presently support such a finding. The Court notes that AOG produced its privilege log on March 28, 2022—roughly a month and a half before the discovery motion deadline in this case—and that AOG subsequently agreed, prior to any Court intervention, to update its privilege log. *See* Doc. 55, p. 16.

Mr. McCarter's notes were prepared while litigation was in prospect. In particular, AOG has provided a sworn declaration from Andrew S. Hagler, senior counsel at Summit, stating that "[l]ate in the week of February 8, 2021," he "learned that prices for natural gas in the middle of the United States had begun to rise dramatically in anticipation of a major winter storm," and that he came to expect "that litigation would result from non-deliveries of natural gas to Summit . . . subsidiaries" because suppliers might "attempt to invoke force majeure as a means of relieving themselves of their contractual obligations to deliver natural gas." *See* Doc. 60-1, ¶¶ 3–5. Accordingly, Mr. Hagler says that he directed Brett Schweiker, Summit's Vice President of Finance, "to have a member of his staff maintain a written record of significant activities and communications related to the price, availability, and delivery (or non-delivery) of natural gas as it affected Summit . . . subsidiaries operating in Arkansas, Oklahoma," and a couple of other states "during the period of abnormally high prices." *See id.* at ¶ 6. AOG has also provided a sworn declaration from Mr. McCarter stating that Mr. Schweiker relayed these instructions to him, that he created a Microsoft Word document pursuant to these instructions, and that "[d]uring the entire period I created the document, it was my understanding that I was creating the document at the direction of Summit['s] in-house counsel." *See* Doc. 60-2, ¶¶ 3–7. Mr. McCarter's declaration also explains that he titled the document "CONFIDENTIAL Memo – FEB 2021 Extreme Weather Events," and that when he sent a copy of the document to outside counsel "in early March, 2021," he "made sure that the document was clearly labeled, 'CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGE." *See id.* at ¶¶ 4, 6.

However, it is not enough to show that Mr. McCarter's notes were prepared while litigation was anticipated. As mentioned in the previous section of this opinion and order, AOG must also show that Mr. McCarter's notes were not prepared in the regular course of business. *See Simon*,

816 F.2d at 401. In other words, a party cannot prospectively cloak documents generated through ordinary business activities with work product protection simply by circulating a memo opining that such documents might eventually become the subject of litigation. The record is insufficiently developed at this time for the Court to determine whether that is what happened with Mr. McCarter's notes; but there is some evidence suggesting that it was. During his deposition Mr. McCarter testified that the notes in question were actually "handwritten," and that it is his normal business practice to take such handwritten notes not only "during this event . . . particularly" but also "in general" in order "to memorialize the conversations" he has with AOG and "our other utilities and suppliers and pipelines." *See* Doc. 55-2, p. 8 (internally numbered 294:6–295:20). After the deposition, following BP's demands for these notes to be produced, Mr. McCarter submitted an errata sheet for his deposition transcript stating that most of his various references to his February 2021 "handwritten" notes or memo should be changed to reference "typed" notes in an "MS Word document," and removing—without explicitly contradicting—the testimony that he took handwritten notes on the occasions at issue here, while substantively preserving his testimony that "I do keep handwritten notes for business purposes, yes." *See* Doc. 60-6, p. 2.

It is unclear to the Court from all of this whether there was any substantive difference in content between the typed notes that Mr. McCarter took in February 2021 and the handwritten notes that Mr. McCarter would have taken during that same period absent Mr. Schweiker's instructions. Indeed, it is unclear whether Mr. McCarter *only* typed notes, or whether he took *both* handwritten *and* typed notes of the conversations at issue here, perhaps generating the latter from the former. The latter scenario seems possible, as it would be consistent with the claims in Mr. McCarter's errata sheet and sworn declaration, and could potentially explain why Mr. McCarter's original deposition testimony referenced handwritten rather than typed notes. However, this

scenario is of course not the only possible explanation for the shifts in Mr. McCarter's testimony.[6] The bottom line is that sorting out these inconsistencies and ambiguities will likely require nuanced credibility determinations that are more appropriately based on live, focused, in-person witness testimony and cross-examination than on mere affidavits and wide-ranging deposition transcripts with errata sheets.

To recap, then: first, BP has shown that Mr. McCarter's notes are relevant to the claims and defenses in this case and responsive to BP's previous discovery requests. Second, AOG has shown that Mr. McCarter's notes were created while litigation was in prospect. Third, AOG has not yet shown that Mr. McCarter's notes were not prepared in the regular course of business. And thus, fourth, the Court has not yet had occasion to determine whether BP has shown that it has a substantial need for these materials to prepare its case and that it cannot, without undue hardship, obtain their substantial equivalent by other means. If this posture ultimately remains unchanged, then the Court will find that these materials are discoverable and it will compel their production, because AOG will not have carried its initial burden of showing that they were not prepared in the regular course of business. However, given what the parties have shown thus far with respect to the first two issues listed above, and given the lack of clarity in the factual record's present state, it is appropriate to give AOG and BP the opportunity to provide further testimony and argument in support of their respective burdens on the third and fourth issues listed above.

---

[6] Regardless of whether Mr. McCarter took only handwritten, or only typed, or both handwritten and typed notes in February 2021, it is noteworthy that the Court has not been directed to any separate entry or entries in AOG's privilege log for these February 2021 notes, independent of Mr. McCarter's March 11, 2021 email to outside counsel, which the Court presumes from the briefing is PRIV000339. *See* Doc. 55-7, p. 35; *see also* Doc. 55, p. 9 (internally numbered p. 5); Doc. 55-6, p. 3 (internally numbered p. 2).

**IV.    Conclusion**

IT IS THEREFORE ORDERED that an evidentiary hearing on Defendant BP Energy Company's motion to compel (Doc. 54) will be held in **Fort Smith, Arkansas**, in the **third-floor courtroom (Room 310)**, at a date and time to be set by separate order. At this hearing, the Court will receive evidence relevant to the following questions regarding the notes that Walt McCarter created in February 2021 and discussed during his Rule 30(b)(6) deposition:

(1) Has AOG shown that these materials are work product?

(2) If yes, then has BP shown that it has a substantial need for these materials to prepare its case and that it cannot, without undue hardship, obtain their substantial equivalent by other means?

IT IS SO ORDERED on this 26th day of May, 2022.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE