UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ARKANSAS OKLAHOMA GAS
CORPORATION                                                           PLAINTIFF

v.                              No. 2:21-CV-02073

BP ENERGY COMPANY                                                     DEFENDANT

## OPINION AND ORDER

This matter came before the Court on December 12, 2022 for a 4-day bench trial on Plaintiff Arkansas Oklahoma Gas Corporation's ("AOG") second amended complaint (Doc. 50) against Defendant BP Energy Company ("BP") for breach of contract.[1]  AOG, a utility company, alleges that during the week of February 15, 2021, when Winter Storm Uri struck Arkansas, BP failed to provide the full amount of natural gas to which AOG was entitled under their contract. AOG claims this was a breach of the parties' contract, and it seeks more than $34 million in damages.  BP argues that its performance during Winter Storm Uri was excused by the contract's *force majeure* clause.

At trial, the parties stipulated to certain facts and exhibits which were received into evidence.  *See* Doc. 112-1.  Many other exhibits were also received into evidence, sometimes over objections.  The Court also heard live testimony from eight witnesses, and received deposition testimony from four other witnesses.  At the conclusion of the trial, the Court took the case under submission.

---

[1] AOG's operative complaint also contained a second count for unjust enrichment, *see* Doc. 50, ¶¶ 30–34, but the Court previously granted BP summary judgment on that claim and dismissed it with prejudice, *see* Doc. 101, pp. 7–8.

Following a bench trial, "the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1).  However, "[t]he trial court need not make specific findings on all facts and evidentiary matters brought before it, but need find only the ultimate facts necessary to reach a decision in the case." *U.S. ex rel. R.W. Vaught Co. v. F.D. Rich Co.*, 439 F.2d 895, 899 (8th Cir. 1971).  Findings are adequate so long as they "afford a reviewing court a clear understanding of the basis of the trial court's decision." *Allied Van Lines, Inc. v. Small Bus. Admin.*, 667 F.2d 751, 753 (8th Cir. 1982) (internal quotation marks omitted). Accordingly, having considered the testimony of the witnesses and the exhibits received into evidence, and having made credibility determinations on the evidence, the Court makes the following findings of fact and conclusions of law.[2]

## I.  Background

### A.  Findings of Fact

AOG is a regulated natural gas utility that serves approximately 58,000 residential, commercial, and industrial customers throughout Western Arkansas and Eastern Oklahoma. *See* Doc. 90, ¶ 1.  BP is a seller and trader of natural gas, incorporated in Delaware with its principal place of business in Houston, Texas. *See* Doc. 56, ¶ 3.  BP supplies natural gas to AOG.

The contract between AOG and BP that was in effect in February 2021 ("the Contract") was comprised of three documents: (1) a standard form Base Contract for Sale and Purchase of Natural Gas, published by the North American Energy Standards Board ("NAESB"), dated December 1, 2016 (the "Base Contract"); (2) Special Provisions attached to the Base Contract that

---

[2] To the extent that any facts were admitted or undisputed prior to trial, then this opinion and order may cite to pleadings or summary judgment materials in support of those findings, rather than to the evidence received at trial.

2

modified certain terms of the Standard Base Contract; and (3) a Transaction Confirmation dated November 5, 2020. *See* Ct. Ex. 1, ¶ 1. Under the Contract, BP agreed to sell AOG up to 30,000 MMBtu of natural gas each day in February 2021, *see* Doc. 79, ¶ 8; Doc. 95, ¶ 8, and to deliver the natural gas to AOG at four locations on the interstate Ozark Gas Transmission, LLC[3] pipeline (the "Ozark Pipeline"): (1) AOG Tobey; (2) AOG McBride; (3) AOG Pocola; and (4) AOG Spiro, *see* Doc. 79, ¶ 9; Doc. 95, ¶ 9. AOG agreed to pay BP an index-based contract price for any natural gas it purchased from BP up to the 30,000 MMBtu maximum. *See* Doc. 79, ¶ 11; Doc. 95, ¶ 11. BP's contractual obligation to deliver this natural gas to AOG was "firm," which meant that BP could not interrupt its performance without liability unless performance was prevented by *force majeure*. *See* Doc. 90, ¶¶ 21–22.

A substantially similar contract has been in place between the parties since 2008. *See* Doc. 79, ¶ 13; Doc. 95, ¶ 13. That year, AOG issued a request for proposal ("RFP") soliciting a supply of natural gas to meet AOG's high demand during the winter months. *See* Pl. Ex. 9. This supply was called "no-notice" gas, *see id.*, Ex. A, which meant that the supplier would have to deliver gas to AOG on demand, without notice, and that AOG was not required to make advance nominations for gas, *see* Doc. 116, pp. 42:13–42:20. AOG accepted an offer that BP submitted in response to the RFP. *See* Pl. Exs. 12, 13. The parties agreed that BP would be paid a premium, called a "demand fee," for supplying no-notice gas on demand. *See* Pl. Exs. 11, 12; *see also* Doc. 116, pp. 43:16–46:22.

Since 2008, BP's general approach has been to secure in advance the amount of natural gas it estimates AOG will use each day and to then obtain any additional gas that is needed by making

---

[3] Ozark Gas Transmission, LLC operates the Ozark Pipeline and is a wholly owned subsidiary of Black Bear Transmission LLC. *See* Ct. Ex. 1, ¶ 3.

same-day gas purchases on the so-called "spot market."  *See* Doc. 79, ¶ 14; Doc. 95, ¶ 14.  Before February 2021, BP never failed to deliver the gas AOG sought to purchase.  *See* Doc. 79, ¶ 15; Doc. 95, ¶ 15.  However, that unblemished record changed with the arrival of Winter Storm Uri in mid-February 2021, which brought ice storms and unprecedentedly low temperatures to the southern region of the United States, including Arkansas and Oklahoma.  *See* Doc. 79, ¶ 59–63; Doc. 95, ¶ 59–63.  These conditions were extraordinarily persistent, causing an enormous drop in natural gas production across the middle of the United States due to wellhead, processing, and pipeline freeze-offs.  *See id.*

As will be discussed at much greater length below, over a period of several days before the storm's arrival BP made arrangements with various sources to supply more gas to AOG than usual, anticipating the likelihood that AOG's demand for gas would increase during the storm.  And indeed, on February 10, 2021, AOG informed BP that it expected to take the full 30,000 MMBtu of gas per day on February 15 and 16.  *See* Doc. 87, ¶ 74; Doc. 90, ¶ 74; *see also* Doc. 79, ¶ 111; Doc. 95, ¶ 111.  However, many of BP's arrangements failed once the storm arrived, and BP was unable to supply AOG with the full amount of gas that AOG required during Winter Storm Uri.

**B.  Legal Standard and Preliminary Conclusions of Law**

Under the Contract's express terms, BP had a firm obligation to supply AOG with up to 30,000 MMBtu of natural gas per day, on demand.  *See* Pl. Ex. 15, p. 1.  BP's failure to supply the full amounts of gas to which AOG was entitled under the Contract was thus a failure to perform a firm obligation under the Contract.  However, BP argues its nonperformance is excused by the contractual provision that "neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure."  *See* Def. Ex. 1, Bates p. -351, § 11.1.  The Contract defines "Force Majeure" as meaning "any cause not reasonably within the

4

control of the party claiming suspension," *id.*, including "weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe," *see id.* at § 11.2.  But the Contract also carves out an exception to this excuse, stating that "[n]either party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by . . . the curtailment of interruptible or secondary Firm transportation unless primary, in-path Firm transportation is also curtailed."  *See id.* at § 11.3(i).

The Contract in this case is governed by Texas law.  *See* Ct. Ex. 1, ¶ 2.  Under Texas law, "[t]he party seeking to excuse its performance under a contractual *force majeure* clause . . . bears the burden of proof to establish that defense."  *Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App. 2009).   In other words, for BP to avoid liability for its nonperformance, BP bears the burden of proving: (1) that Winter Storm Uri caused BP's failure to supply the full amounts of natural gas that AOG required (up to 30,000 MMBtu) during the week of February 15, 2021; and (2) that either (a) BP's performance was not affected by the curtailment of interruptible or secondary firm transportation; or (b) primary, in-path firm transportation was also curtailed.

## II.    Liability

### A.  Findings of Fact

Different pipelines offer different portfolios of transportation service.  Firm transportation is a transportation service that cannot be curtailed in the absence of *force majeure*.  BP had a firm transportation service agreement with the Ozark Pipeline.  *See* Pl. Ex. 24.  By contrast, interruptible transportation service permits curtailment of transportation for reasons other than *force majeure* or, depending on the terms of the agreement, potentially even for no reason at all.  Additionally,

some pipelines offer a physical gas-storage service; however, the Ozark Pipeline did not offer storage.  *See* Doc. 117, pp. 409:4–409:6.[4]

As already mentioned, the Contract obligated BP to deliver gas to AOG on the Ozark Pipeline.  However, the Contract did not specify how BP was to obtain supplies to meet this contractual obligation.  Historically, BP generally used two methods of obtaining gas for AOG. First, BP utilized long-term supply contracts with "on-system" producers who were connected to the Ozark Pipeline.  (An on-system producer is one whose supply feeds directly from its wellhead or gathering system into the pipeline.  *See* Doc. 117, pp. 449:3–449:11.)  Then, if AOG needed more gas than BP's on-system suppliers were contracted to provide, BP would source additional gas from off-system producers, typically by purchasing it on the spot market.  *See id.* at 458:22– 459:4.

To facilitate flexibility for AOG's no-notice needs, BP contracted with the Ozark Pipeline for a service called "park and loan" ("PAL").  BP routinely utilized PAL long before Winter Storm Uri's arrival.  *See* Doc. 79, ¶ 21; Doc. 95, ¶ 21; *see also* Doc. 117, pp. 350:14–350:21, 443:21– 445:10.  PAL is neither a transportation service, *see* Doc. 79, ¶ 22; Doc. 95, ¶ 22, nor a physical storage service, *see* Doc. 117, pp. 409:4–409:6.  Rather, PAL is an interruptible balancing service provided by pipelines that allows shippers to receive credit for the excess of gas placed in the pipeline by that shipper on a given day over the amount the shipper takes off the pipeline that day, *see* Doc. 90, ¶ 35.  Later, the shipper can "unpark" that "parked" gas by taking more gas off the pipeline than the shipper delivers to the pipeline.  *See id.*  "Parked" gas is not physically stored; rather, it is an accounting credit that allows a shipper to "unpark" gas from the pipeline's "line

---

[4] Citations to the official transcript of the bench trial are to the document's internal page numbers rather than to the ones contained within the document's filemarks.

pack," which is the amount of gas exceeding that being transported for delivery in a segment of pipeline. *See id.*

BP designated the McBride interconnection on the Ozark Pipeline as its "parking/loaning point." *See id.* at ¶ 41. However, AOG was able to withdraw gas from other delivery points besides McBride, *see* Doc. 116, pp. 123:23–124:2, and could do so without making advance nominations for the gas. Instead of making advance nominations, AOG would typically inform the Ozark Pipeline of how much gas it wished to take just before taking the gas. *See* Doc. 79, ¶ 17; Doc. 95, ¶ 17. This practice was facilitated by a separate "operational balancing agreement" that AOG had with the Ozark Pipeline, under which AOG was allowed to take more or less gas from the Ozark Pipeline than it had scheduled for delivery on a given day. *See* Doc. 116, pp. 123:20–128:14. A few days later, BP would "true up" AOG's imbalance with Ozark, even though BP was not a party to that operational balancing agreement between AOG and the Ozark Pipeline. *See id.* In other words, BP's PAL agreement with Ozark functioned in concert with AOG's operational balancing agreement with Ozark to establish accounting mechanisms that facilitated the no-notice Contract between AOG and BP.

As a courtesy, AOG often provided BP with estimates of how much gas it would use, and when those estimates were larger than usual then BP would purchase additional supply as necessary; but the Contract did not require AOG to send BP estimates. *See* Doc. 116, pp. 118:20–118:23, 224:17–225:6; Doc. 117, pp. 444:4–444:13, 446:15–448:4, 458:22–459:21. Likewise, the Contract did not require AOG to nominate[5] gas, and indeed AOG has never nominated gas under the Contract. *See* Doc. 116, pp. 125:19–126:9, 127:2–127:22. This is because the Contract was a

---

[5] "Nomination" is the formal scheduling of a specific quantity of gas to be taken on a pipeline, and is typically performed at least one day in advance of the scheduled flow date. *See* Doc. 116, pp. 40:13–41:25.

no-notice contract.  *See* Def. Ex. 2, p. 2.  The Contract does not define "no-notice" but, as already discussed above, the term is commonly used in the industry to mean that a utility company can receive gas without making advance nominations.  *See* Doc. 116, pp. 42:13–42:20, 44:6–44:11, 65:25–66:4; Doc. 117, pp. 276:5–277:25.

PAL is an interruptible service, and has the lowest priority of all the services provided on the Ozark Pipeline, which means it is made available only after all other services are available on the pipeline.  *See* Doc. 90, ¶¶ 36, 41.  At the end of the day on February 12, BP had a balance of 38,527 MMBtu in its PAL on the Ozark Pipeline.  *See* Doc. 79, ¶ 31; Doc. 95, ¶ 31; *see also* Def. Ex. 80.  However, three days earlier the Ozark Pipeline had already curtailed PAL in anticipation of Winter Storm Uri, prohibiting users from withdrawing any gas that was not already physically on the pipeline until further notice.  *See* Doc. 116, pp. 81:12–82:11; Pl. Ex. 22.  This made BP's PAL balance nearly useless during Winter Storm Uri, leaving AOG almost completely reliant on whatever other sources of gas BP had arranged.[6]  BP did make other arrangements, which will be discussed in more detail below.  But those arrangements ultimately failed; and beginning on February 15, BP failed to physically deliver onto the Ozark Pipeline sufficient quantities of gas to meet AOG's needs.  *See* Doc. 116, pp. 82:12–84:11.

As of February 2021, natural gas could enter the Ozark pipeline only through on-system production, or through one of two intrastate pipelines that connect to the Ozark Pipeline.  The two intrastate pipelines that connect to the Ozark Pipeline are: (1) the pipeline owned by Enable Oklahoma Intrastate Transmission, commonly referred to as the "EOIT" Pipeline or the "Enogex"

---

[6] The Court says "nearly" and "almost" because on February 15 and February 16 the Ozark Pipeline apparently allowed AOG to withdraw 6,980 and 6,611 MMBtu of gas, respectively, that BP had not already physically placed on the pipeline, notwithstanding the prior curtailment notice. *See* Def. Ex. 80.

Pipeline, and (2) the pipeline owned by OneOK Gas Transportation, LLC, referred to as the "OneOK" Pipeline. *See* Ct. Ex. 1, ¶ 4. These two intrastate pipelines connect with the Ozark Pipeline in Oklahoma—EOIT at a point called the "Boiling Spring" interconnect, and OneOK at a point near Boiling Spring called the "Lequire" interconnect. *See* Doc. 117, pp. 300:5–300:11; Doc. 119, pp. 880:8–880:12; Pl. Ex. 65. BP made arrangements with several different on-system and off-system producers, as well as with EOIT, for a total of 29,425 MMBtu per day to be delivered to AOG through the Ozark Pipeline on February 15 and 16, and for the delivery of 24,425 MMBtu per day on February 17 through 19.

The on-system producers with which BP contracted were Merit Energy Company, LLC ("Merit") and Wells Fargo Commodities, LLC ("Wells Fargo"). These were long-standing contracts which significantly predated Winter Storm Uri. BP's contract with Merit called for the delivery of 12,000 MMBtu per day during the month of February 2021, of which 8,400 was the "baseload" component and 3,600 was the "swing" component. *See* Def. Ex. 13, p. 1; Def. Ex. 14, p. 1. (Pricing for the swing component was tied to the daily market, while pricing for the baseload component was monthly.) *See* Def. Ex. 13, p. 1. BP's contract with Wells Fargo was for the delivery of 1,725 MMBtu per day during that same period. *See* Def. Ex. 15. Wells Fargo managed to deliver nearly all of what it promised during Winter Storm Uri, providing the full 1,725 MMBtu per day on February 15 through 17, and 1,640 MMBtu per day on February 18 and 19. *See* Def. Ex. 81. However, Merit only delivered 3,150 MMBtu on February 15, and did not deliver any gas at all on February 16 through 19. *See id.* Meanwhile, the Ozark Pipeline never curtailed BP's transportation service during Winter Storm Uri. *See* Ct. Ex. 1, ¶ 5.

Both Merit and Wells Fargo sent BP notices of *force majeure* dated February 12, 2021, citing the ongoing severe winter weather as the cause.[7]  *See* Def. Exs. 19–20.  The Court finds that Winter Storm Uri was in fact the cause for BP's loss of supply from Merit and Wells Fargo, given: the temporal proximity of Winter Storm Uri with those two producers' failures to deliver the amounts for which they contracted; the fact that production declined as the storm wore on instead of being abruptly curtailed; Wells Fargo's substantial performance despite the storm; Merit's financial incentive to produce the full quantity of gas if possible in order to take advantage of soaring daily-index prices during Uri; and the availability of transportation on Ozark for both producers.

As for off-system sources, BP contracted with the EOIT Pipeline and a marketer called Koch Energy Services, LLC (hereinafter "Koch") for gas to be delivered to AOG on the Ozark Pipeline during the week of February 15 through 19.  On February 12, BP moved 10,700 MMBtu of natural gas sourced from an entity called Unbridled Resources, LLC, onto the Ozark Pipeline from the EOIT Pipeline through the Boiling Spring interconnect.  *See* Doc. 79, ¶ 37; Doc. 95, ¶ 37. BP paid the maximum rate for that transportation, thereby reserving that capacity at the highest interruptible transportation priority on EOIT for each remaining day of February 2021.  But that reservation was still for interruptible transportation service—not firm.[8]  On February 15, the EOIT

---

[7] Notwithstanding the date on the letterhead of Merit's notice, it was not emailed to BP until February 16, 2021.  *See* Doc. 20.

[8] BP's transportation agreement with the EOIT Pipeline was explicitly an "Interruptible Transportation Service Agreement."  *See* Pl. Ex. 38.  However, BP offered testimony opining that BP's February 12 nomination somehow transformed BP's service into firm rather than interruptible transportation.  *See, e.g.*, Doc. 117, pp. 492:13–497:12; *but see* Doc. 118, pp. 582:3–588:25.  The Court finds this testimony entirely lacking in credibility on this point.  The EOIT Pipeline's Statement of Operating Conditions Applicable to Transportation Services explicitly discusses the type of transaction that BP made on February 12, and is perfectly clear that it is a means of acquiring higher priority among interruptible shippers but not for acquiring firm

Pipeline issued an operational order anticipating it would be "unable to provide any tolerance for short positions outside of firm contractual rights" in order to "maintain . . . operational integrity," but that it would continue to "provide services in accordance with the customers' contractual rights." *See* Def. Ex. 178. Since BP had not contracted for firm transportation rights on the EOIT Pipeline, the gas from Unbridled was not permitted to flow during Winter Storm Uri. *See* Doc. 119, p. 902:2–902:25.

Additionally, BP contracted with Koch to purchase 5,000 MMBtu of gas per day, from February 13 through 16, 2021, at a rate of $500 per MMBtu. *See* Doc. 79, ¶ 40; Doc. 95, ¶ 40. Koch planned to transport this natural gas from the EOIT Pipeline onto the Ozark Pipeline. *See* Doc. 79, ¶ 42; Doc. 95, ¶ 42. However, because of the EOIT Pipeline's curtailment of interruptible transportation, and because neither BP nor Koch had contracted for firm transportation, BP did not receive any of this contracted-for gas from Koch on February 15 or February 16. *See* Doc. 79, ¶¶ 80–81, 83–84; Doc. 95, ¶¶ 80–81, 83–84. Koch sent BP a notice of *force majeure* dated February 23, 2021. *See* Def. Ex. 21. Much like Merit and Wells Fargo, Koch cited the ongoing severe winter weather as the cause. *See id.* However, there is an important factual difference between Koch's situation and that of Merit and Wells Fargo: although the Ozark Pipeline never curtailed BP's transportation service during Winter Storm Uri, the EOIT Pipeline did. Unlike Merit and Wells Fargo, Koch had the gas ready for delivery; but the EOIT Pipeline simply did not allow it to be delivered on February 15 and 16. *See* Doc. 117, pp. 426:3–426:14. Therefore the Court finds that although Winter Storm Uri contributed indirectly to Koch's failure to deliver gas

---

transportation. The document speaks for itself and is neither vague nor ambiguous on this point. *See* Def. Ex. 225, "Clean SOC" attachment, § 4.1(B). An expert witness for AOG, Richard Smead, testified consistently with the Court's understanding of these matters. *See* Doc. 117, pp. 308:8–309:23.

to BP (and AOG) on those days, the direct and proximate cause was that neither BP nor Koch secured firm transportation rights on the EOIT Pipeline during the relevant period.[9]  The same is true for all other gas BP arranged to be transported to AOG over the EOIT Pipeline but which was not delivered during Winter Storm Uri.

BP offers several arguments against this finding, but none is persuasive.  One is an assertion that the EOIT Pipeline curtailed *all* transportation, not merely interruptible transportation, such that it would have made no difference whether firm transportation had been secured.  But this argument is belied not only by the plain language of EOIT's February 15 operational order, but also by the meter readings during the relevant period.  There are two interconnects where gas flows onto the Ozark Pipeline from EOIT: Boiling Spring, and Transok, which are located right next to each other.  *See* Doc. 119, pp. 920:23–921:23.  Meter readings show that gas flowed from EOIT to Ozark through the Boiling Spring interconnect on February 15, 18, and 19, but not on February 16 or 17.  *See* Def. Ex. 84, pp. 4–5.  However, meter readings also show that during this same period 30,700 dekatherms of gas consistently flowed each day from EOIT onto Ozark through Transok.  *See id.*  Clearly, then, there was no period during Winter Storm Uri when EOIT curtailed *all* transportation.

In a similar vein, BP points out that there were entities which had firm transportation contracts at Boiling Spring, *see* Doc. 118, pp. 768:22–773:17; Def. Ex. 235, pp. 18–31, and that meter readings show these entities also had no gas delivered through Boiling Spring during the relevant period.  *See* Def. Ex. 84, pp. 4–5.  BP argues the Court should infer from this fact that

---

[9] Koch's notice to BP was very broad and generic in its description of the basis for its declaration of *force majeure*, but among the causes listed was "interruptions and curtailments of . . . transportation and deliveries by third parties" during Winter Storm Uri.  *See* Def. Ex. 21.

EOIT curtailed firm transportation even though it never formally announced it was doing so.  But the Court believes it is far more likely that these entities simply did not nominate any gas to be delivered through Boiling Spring during Winter Storm Uri, since the meter readings show that no gas flowed through Boiling Spring under these firm contracts at *any* point from February 8 through February 20, 2021, *see* Def. Ex. 84, even though EOIT's curtailment was not announced until February 15.

BP also argues that delivery of its gas onto the Ozark Pipeline from the EOIT Pipeline was prevented by a compressor outage that occurred somewhere on the EOIT Pipeline, rather than by a decision on the part of the EOIT Pipeline to curtail non-firm transportation.  However, this claim is not supported by any competent evidence.  No testimony regarding the alleged compressor outage was provided by any witness with direct knowledge of the matter.  And even the hearsay testimony on the topic was ambiguous at best.

For example, Scott Langston (senior vice president and chief commercial officer of Black Bear Transmission, LLC) provided the following testimony:

> Q:   Do you know whether Winter Storm Uri had any effect on the Enable Oklahoma pipeline?
>
>       . . .
>
> A:   My understanding is that pipeline was impacted by the storm.  I believe some of its facilities and production flowing into that pipeline that was impacted, that was based on conversation that we had with an EOIT representative.
>
> Q:   Do you know which facilities were impacted?
>
> A:   We were told that a compressor that operated and helped support deliveries to Ozark was not available for a period of time.
>
> Q:   And that compressor was not available because of issues related to the storm; is that fair?

> . . .
>
> A:   We believe weather contributed to the compressor challenges.  I can't speak
>      on that, all of the causes.  But we believe weather was a contributing factor.
>
> Q:   And because of that issue with the compressor, the EOIT pipeline was not
>      delivering gas on to Ozark for a period of time after the storm; is that fair?
>
> . . .
>
> A:   EOIT delivered quantities lower[] than scheduled volumes for a period of
>      time, and there was a brief period that EOIT deliveries to Ozark were
>      suspended entirely.

Def. Ex. 221, pp. 86:17–88:4 (objections omitted).   Later, Mr. Langston had the following

exchange with counsel for AOG:

> Q:   You also said that during Winter Storm Uri there was a brief period in which
>      EOIT did not deliver to Ozark; how long was that period?
>
> A:   It was in between zero and 90 minutes, I would say.  I can't recall the exact
>      duration.   I believe the extension of deliveries were—was—we could
>      probably find the operational data.  So it was not greater than two hours,
>      that's my understanding.
>
> Q:   Other than that not-greater-than-two-hour period, EOIT was delivering at
>      least some gas to the Ozark Pipeline during Winter Storm Uri?
>
> A:   That's correct.  At least some.

*Id.* at 101:19–102:10.

Mr. Langston's testimony on whether and why the compressor outage occurred is hearsay

and speculative.  ("We were told that . . . ."  "We believe . . . ."  "I can't speak on that . . . .")  It

also provides no information on where the compressor was located, whether at Boiling Spring or

elsewhere.  But even assuming a compressor outage occurred and that it was caused by Winter

Storm Uri, Mr. Langston's testimony does not support the proposition that this outage stopped

deliveries from EOIT to Ozark for any longer than two hours.   Similar problems afflict the

testimony provided by Walt McCarter, *see* Doc. 116, pp. 152:6–153:12, 203:6–204:4, 217:8–

218:25, and Richard Smead, *see* Doc. 117, pp. 384:18–385:16, 387:9–389:10, as well as records of internal instant message communications between AOG employees, *see, e.g.*, Def. Ex. 134, p. 1 (explaining that "Ozark was . . . cutting that entire [BP] package for today due to supply shortages and a failed compressor somewhere"), all of which is simply a conduit for hearsay from EOIT. No evidence, hearsay or otherwise, was ever introduced regarding precisely when the compressor outage occurred, where it occurred, why it occurred, or why it would have affected deliveries at Boiling Spring but not at Transok. Meanwhile, EOIT's February 15 operational order announcing its curtailment of non-firm transportation made no mention of any compressor outage. *See* Def. Ex. 178. BP has not carried its burden of proving that a compressor outage even occurred, much less that this outage was the reason why BP's gas was not delivered to AOG from EOIT.[10]

So far, the Court has discussed the failure to deliver gas that BP arranged to be delivered to AOG during Winter Storm Uri. But there is also the matter of gas that BP did *not* arrange for delivery. As mentioned above, BP arranged for a total of 29,425 MMBtu per day to be delivered to AOG through the Ozark Pipeline on February 15 and 16, and for the delivery of 24,425 MMBtu per day on February 17 through 19. This, of course, is less than the 30,000 MMBtu per day that BP was contractually obligated to provide to AOG upon request. So the question also arises whether this shortfall is excused by *force majeure*.

In the Court's order on the parties' cross-motions for summary judgment, it observed:

> AOG contends that BP's failure was not caused by Winter Storm Uri itself, but rather was caused by BP's failure to secure sufficient firm sources of gas supply and transportation prior to the Storm. BP disagrees, arguing among other things that it was either impossible or commercially unreasonable to obtain additional firm sources of gas supply for AOG, that doing so would have made no difference during Winter Storm Uri anyway, and that regardless BP had no legal obligation to do so.

---

[10] Interestingly, although EOIT is the one entity that presumably could have provided competent testimony on the compressor outage, no EOIT representatives were ever called to testify by either side.

To the last point, BP asserts that "Texas law is well established that due diligence is not required under force-majeure clauses." *See* Doc. 97, p. 4 (quoting *Moore v. Jet Stream Invs., Ltd.*, 261 S.W.3d 412, 422 (Tex. App. 2008)). However, Texas law is actually more nuanced than that; *Moore* itself qualifies this rule with "[u]nless the [contract] provides otherwise." *See Moore*, 261 S.W.3d at 422. The bottom line under Texas law is that parties must expend as much reasonable effort or due diligence to avoid force majeure events or their effects as their contracts require, and no more than that. *See, e.g.*, *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 283–84 (Tex. App. 1998) (distinguishing the contract before it with the one in *United Gas Pipe Line Co. v. F.E.R.C.*, 824 F.2d 417, 432 n.19 (5th Cir. 1987), the latter expressly limiting force majeure events to those "which by the exercise of due diligence [the invoking party] was unable to prevent or overcome").

Here, the Contract defines force majeure as "any cause *not reasonably within the control* of the party claiming suspension." (Doc. 85-1, p. 22) (emphasis added). Obviously BP cannot control the weather; so to whatever extent Winter Storm Uri was the cause of BP's failure to perform, then that cause was not reasonably within BP's control. But likewise, to whatever extent BP's failure to perform was caused by its failure to secure sufficient firm supply or transportation, then BP can avoid liability only if its failure to secure sufficient firm supply or transportation was "not reasonably within [its] control." Importantly, Section 11.1 contemplates the possibility that a failure to perform can be caused in part by a force majeure event and in part by circumstances reasonably within the control of the party claiming suspension; and under such circumstances it only protects the invoking party from liability "*to the extent* such failure was caused by" the force majeure event. *See id.* (emphasis added).

(Doc. 101, pp. 4–6) (internal footnotes omitted).

BP made many unsuccessful efforts to secure more gas than it was ultimately able to arrange for delivery to AOG in anticipation of Winter Storm Uri. *See, e.g.*, Doc. 117, pp. 472:13–480:7. The Court finds that under the circumstances, at the time BP learned of Winter Storm Uri's approach, these were reasonable efforts to avoid Winter Storm Uri's effects. However, the Court also finds that these last-minute efforts would not have been necessary if BP had previously secured sufficient firm supply and firm transportation to provide AOG with 30,000 MMBtu of natural gas per day on demand.

BP built its supply structure for AOG based on AOG's historical use of gas. *See* Doc. 117, pp. 442:12–445:10. Prior to Winter Storm Uri, AOG's average historical usage was between

10,000 and 12,000 MMBtu per day, which obviously is nowhere near the maximum 30,000 MMBtu per day to which it was entitled under its Contract with BP. *See id.* at 441:19–442:11. BP provided expert testimony opining that securing firm supply and transportation for 30,000 MMBtu per day despite AOG's much lower historical usage would have been an unusual practice among gas marketers, and that doing so would have been expensive. *See id.* at 462:21–465:3; Doc. 119, pp. 807:19–812:24. But even if the Court credits these opinions, the Court believes they are ultimately beside the point. AOG's average use is not relevant to the Contract. BP entered into a firm contract to provide AOG up to 30,000 MMBtu of gas per day, on demand, with no advance notice required. BP then failed, for many years, to enter into sufficiently firm, redundant, or contingent contractual relationships with pipelines and suppliers to guarantee this amount of gas would always be available to AOG on short or no notice. *See* Doc. 117, pp. 313:8–316:6.

The Court finds that BP's decision not to make such arrangements was a conscious business decision that was made by and "reasonably within the control of" BP. *See* Doc. 119, pp. 809:1–809:5. Instead, BP gambled that if the day ever arrived when AOG should demand the full 30,000 MMBtu, then BP would be able to find whatever it needed on the spot market and to transport the gas over the EOIT Pipeline on an interruptible contract. *See* Doc. 117, pp. 458:9–462:5; Doc. 118, pp. 566:24–567:11. But when that day finally arrived, BP lost its gamble and breached the Contract.

The Court therefore finds that this business decision and Winter Storm Uri were equal causes of BP's inability to arrange for delivery of the full 30,000 MMBtu of gas per day to AOG during Winter Storm Uri. However, as discussed earlier in the "Legal Standard" subsection of this opinion and order, for BP to reduce its liability for this shortfall it must show not only that Winter Storm Uri was a contributing cause, but also that either: (a) BP's performance was not affected by

17

the curtailment of interruptible or secondary firm transportation; or (b) primary, in-path firm transportation was also curtailed.  BP has failed to do this.  It did not submit any proof regarding whether its last-minute attempts at purchasing gas on the spot market were affected by transportation curtailment.[11]  Since BP has not carried its burden of showing the impact, or lack thereof, of transportation curtailment on its failures to obtain gas on the spot market, the Court finds that BP's inability to arrange for delivery of the full 30,000 MMBtu of gas per day to AOG during Winter Storm Uri is not excused by *force majeure*.

One issue remains on the topic of liability, which is whether BP breached the Contract by failing to divert any gas to AOG during Winter Storm Uri from another utility company called Black Hills Energy Arkansas, Inc. ("Black Hills"), who is also a customer of BP.  *See* Doc. 119, pp. 879:12–880:25.  The Contract's "Special Provisions" to Section 11.2 provide that "[t]o the extent an event of Force Majeure occurs, Seller or Buyer will allocate the supply or purchase of Firm Gas for affected transactions, as applicable, on a pro rata basis with other similarly situated Firm Gas customers."  *See* Def. Ex. 1, Bates p. -342.  There is no dispute that BP did not divert any gas from Black Hills to AOG during Winter Storm Uri.  However, BP contends this was not a breach of the Contract because Black Hills and AOG were not "similarly situated" customers. The Court agrees.

---

[11] In fact, the record contains some evidence that BP's attempts at purchasing spot gas *were* affected by transportation curtailment.  For example, on February 10 BP asked Tenaska, a gas marketer, if it was selling any gas on Ozark for February 12 through 16.  *See* Def. Ex. 70.  Tenaska responded that it was not.  *See id.*  Tenaska also happened at that time to be under a long-term contract to provide gas directly to AOG, and continued providing gas to AOG throughout Winter Storm Uri; but it did so by rerouting these deliveries to a different pipeline instead of the Ozark Pipeline which they normally used under that contract with AOG.  *See* Doc. 116, pp. 98:8–99:12. This implies that Tenaska's reason for rebuffing BP's request might not have been a lack of supply, but rather that Tenaska was having problems with transportation on or to the Ozark Pipeline.

As previously mentioned, the OneOK and EOIT Pipelines are the two intrastate pipelines that connect to the Ozark Pipeline. Somewhat similarly to its contract with AOG, BP has a firm contract with Black Hills for delivery of natural gas. *See* Def. Exs. 7, 11. However, although BP's contracts with AOG and Black Hills are both firm, the Black Hills contract is for a fixed amount (15,000 MMBtu) of gas per day, *see* Def. Ex. 11, while the AOG contract is variable. And unlike with AOG, BP delivers that gas to Black Hills over the OneOK Pipeline rather than EOIT. Specifically, BP delivers natural gas over the OneOK Pipeline to an interconnect with the Ozark Pipeline, from which point the gas is then delivered to Black Hills using Black Hills' own firm transportation contract with the Ozark Pipeline. *See* Doc. 119, pp. 887:24–889:2.

The upshot of this arrangement is that although BP holds title to the gas while it is on the OneOK Pipeline, Black Hills takes title to this gas once it hits the interconnect with the Ozark Pipeline. *See id.* at 889:20–890:23. Furthermore, although BP's transportation agreement with OneOK is firm, it is exclusively for gas destined to Black Hills. *See id.* at 881:10–885:11; *see also* Doc. 118, pp. 617:25–618:13. This effectively means that in order to divert gas from Black Hills to AOG, BP needs permission to do so either from OneOK (in the form of additional transportation capacity) or from Black Hills (in the form of additional supply). In anticipation of Winter Storm Uri, BP asked OneOK to sell it additional transportation capacity and asked Black Hills to loan it gas; but both of these requests were declined. *See* Doc. 79, ¶¶ 96, 100; Doc. 95, ¶¶ 96, 100. Thus BP's relationships with Black Hills and AOG were characterized by logistical and contractual differences that prevented BP from diverting any gas from Black Hills to AOG. Therefore, the

Court finds that Black Hills and AOG were not "similarly situated Firm Gas customers" for purposes of BP's contract with AOG.[12]

### B.  Conclusions of Law

The Court's November 21, 2022 summary-judgment opinion and order discussed Texas law on *force majeure*, and noted that most of the cases cited by both parties were unhelpful because they involved different industries, different types of events, or different states' laws.[13]  *See* Doc. 101, pp. 5–6 & nn. 2–4.  However, a couple of important general principles should be mentioned.

First, under Texas law, the scope and application of *force majeure* is "utterly dependent upon the terms of the contract in which it appears."  *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 283 (Tex. App. 1998).  Texas courts do not impose additional duties of due diligence or efforts to overcome the effects of *force majeure* events that are not required by the governing contract; nor do they decline to impose such duties when the contract requires them.  *See id.* at 283–84; *see also Moore v. Jet Stream Invs., Ltd.*, 261 S.W.3d 412, 422 (Tex. App. 2008).  Here, the Contract defines *force majeure* as "any cause not reasonably within the control of the party claiming suspension."  *See* Def. Ex. 1, Bates p. -351, § 11.1.  As the Court observed in its previous order:

> Obviously BP cannot control the weather; so to whatever extent Winter Storm Uri
> was the cause of BP's failure to perform, then that cause was not reasonably within
> BP's control.  But likewise, to whatever extent BP's failure to perform was caused

---

[12] AOG did not present any evidence at trial in support of its claim that AOG and Black Hills were "similarly situated" for purposes of the Contract.

[13] Two of the supplemental authorities that BP submitted post-trial—opinions from the case of *MIECO LLC v. Pioneer Nat. Res. USA, Inc.*, Case No. 3:21-cv-1781-B (N.D. Tex.), *see* Docs. 121, 124, 131, 132—are similarly unhelpful.  That case turns on a materially different *force majeure* clause that imposes a variety of additional requirements not present under the instant Contract, *see* Doc. 121-1, p. 11 (internally numbered as p. 10), which is governed by a different state's law (New York rather than Texas), as applied to materially different facts (loss of a seller's supply from its own production facilities rather than from third-party facilities, *see id.* at 3 (internally numbered as p. 2)).  *MIECO* is thus inapposite, despite dealing with Winter Storm Uri's impact on the natural gas industry.

by its failure to secure sufficient firm supply or transportation, then BP can avoid liability only if its failure to secure sufficient firm supply or transportation was "not reasonably within [its] control."

(Doc. 101, p. 5) (internal footnote omitted).

Second, and relatedly, when a contract requires delivery of gas at a specific point, Texas law does not require a gas supplier invoking *force majeure* to attempt delivery at some different point. *See Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App. 2009). Here, as already mentioned, the Contract obligated BP to deliver gas to AOG at four specific locations on the Ozark Pipeline. *See* Doc. 79, ¶ 9; Doc. 95, ¶ 9. So it is irrelevant to BP's defense in this case whether it could have delivered gas to AOG at some other location, as BP had no obligation to explore such alternatives.

Applying these legal principles to the factual findings made in the preceding subsection, the following conclusions of law result:

- BP's failure to divert gas from Black Hills to AOG during Winter Storm Uri was not a breach of the Contract;

- BP's failure to supply AOG with the full amount of gas AOG required (up to 30,000 MMBtu per day) during Winter Storm Uri was a breach of the Contract;

- The loss of gas supply that BP arranged with Merit and Wells Fargo is excused by *force majeure*;

- The loss of gas transportation that BP arranged to be delivered over the EOIT Pipeline (including from Koch) is not excused by *force majeure*; and

- The difference between the full 30,000 MMBtu per day to which AOG was entitled and the amount of gas that BP actually arranged to deliver to AOG during Winter Storm Uri also is not excused by *force majeure*.

### III.  Damages

#### A.  Findings of Fact

Before the Court can calculate the amount of damages to which AOG is entitled, it must address a threshold question: for how many days during Winter Storm Uri was AOG damaged? There is no dispute that, as discussed earlier in this opinion and order, AOG informed BP on February 10 that it expected to use the full 30,000 MMBtu of gas to which it was entitled on February 15 and 16.  And there is no evidence that AOG ever provided BP any estimate of its gas needs for February 17 through 19.  BP argues that AOG is not entitled to recover on its claims for February 17 through 19, as AOG cannot prove it needed or intended to use any gas on those dates beyond the amounts it actually used (which was far less than 30,000 MMBtu per day).  The Court disagrees and finds that, but for BP's breach of contract, AOG would have used the full 30,000 MMBtu to which it was entitled on each day from February 15 through 19.  Four points should be made in support of this finding.

First, it bears repeating that this was a no-notice contract, which means AOG had no duty to give BP advance estimates of the amount of gas it intended to take.  So the fact that AOG never provided BP any advance estimate of its gas needs for February 17 through 19 does not contractually preclude BP's liability for damages that AOG may have suffered on those days.

Second, and more to the point, AOG's manager of gas supply and contracting (Walt McCarter) testified that AOG would have taken the full 30,000 MMBtu of no-notice gas from BP each day from February 15 through 19 if it had been available.  *See* Doc. 116, pp. 94:17–96:11. This testimony, which the Court finds credible, is essentially unrebutted.  The only evidence BP introduced which might undermine this testimony is internal AOG forecasts dated February 14, which estimated that AOG might need anywhere from 3,680 to 22,139 MMBtu of gas on February

17, from 3,680 to 22,139 MMBtu on February 18, and from 6,012 to 22,130 MMBtu on February 19. *See id.* at 190:12–195:12; Def. Ex. 38. But these estimates were based on historical averages, and were produced before AOG had any clear picture of what the weather would actually be on February 17 through 19. *See* Doc. 116, pp. 209:14–214:3. Therefore the Court considers these forecasts to be less reliable than Mr. McCarter's testimony on this point, which was informed by his knowledge of the actual weather conditions on those dates.

Third, it makes no difference that AOG ultimately did not take anywhere near the full 30,000 MMBtu per day to which it was entitled on February 17 through 19. BP's failure to deliver the full 30,000 MMBtu per day on February 15 and 16 caused AOG's system pressures to drop steadily towards dangerous levels, as the amount of gas being used by AOG's customers significantly exceeded the amount of gas coming onto the system. *See id.* at 85:25–87:22. This forced AOG to implement, beginning on February 15, a multi-tier curtailment plan for the purpose of maintaining system pressure, which effectively resulted in AOG first shutting off the gas to all of its larger industrial customers, and then mandating that all of its smaller commercial customers stop their gas usage as well. *See id.* at 87:23–94:8. None of this curtailment would have been necessary if AOG had received the full 30,000 MMBtu of gas per day to which it was entitled under the Contract. *See id.* at 94:9–94:16, 190:12–190:15. AOG could not responsibly lift the curtailment until it was certain there was sufficient gas supply in place to meet the resulting demand. *See id.* at 104:22–105:3. And BP was not able to provide AOG that certainty at any point during the week from February 15 through 19. *See id.* at 99:13–105:3; *see also* Pl. Ex. 52. In other words, the relatively low quantities of gas that AOG ultimately took from BP on February

17 through 19 do not undermine the conclusion that AOG was damaged on those days—rather, they *support* it.[14]

Fourth, and finally, BP argues that the damages AOG is seeking to recover for February 17 through 19 are consequential damages, which are expressly prohibited by the Contract.  *See* Def. Ex. 1, Bates p. -351, § 13.  The Court disagrees, and believes these are not consequential damages.  Consequential damages "compensate the plaintiff for foreseeable losses that were caused by the breach but were not a necessary consequence of it."  *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022).  An example of consequential damages here would be if AOG were seeking to recover profits it lost because customers angered by the curtailment of their service during Winter Storm Uri decided to switch to a different utility provider.  *See, e.g.*, *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 278–79 (Tex. 2015); *Basic Cap. Mgmt., Inc. v. Dynex Com., Inc.*, 348 S.W.3d 894, 901–04 (Tex. 2011).  However, even if the damages AOG seeks for February 17 through 19 were a form of consequential damages, it would not come within the Contract's limitation on that type of recovery because the recovery AOG seeks for those days is expressly provided for elsewhere in the Contract as liquidated damages.  *See* Def. Ex. 1, Bates p. -351, § 13 (limiting recovery to "direct actual damages" only

---

[14] The aforementioned three factors distinguish the instant matter from the facts of *LNG Americas, Inc. v. Chevron Nat. Gas*, Case No. 4:21-cv-2226 (S.D. Tex. Apr. 12, 2023), which BP submitted in a post-trial notice of supplemental authority.  *See* Doc. 129.  The contract in *LNG Americas* apparently was <u>not</u> a no-notice contract.  *See* Doc. 129-1, p. 2 (internally numbered as p. 1) (referring to contract as "fixed").  The plaintiff in *LNG Americas* did not take the full amount of gas to which it was contractually entitled during the relevant period despite having the opportunity to do so.  *See id.* at 26–27 (internally numbered as pp. 25–26).  And because the plaintiff in *LNG Americas* was a gas marketer, not a utility, *see id.* at 2 (internally numbered as p. 1), there is no good reason to believe it was forced (or even had the ability) to implement curtailments on end users of natural gas.  Rather, LNG Americas' decision to decline gas from the defendant almost certainly was caused by a lack of demand from local distribution companies to which it marketed—*i.e.*, LNG Americas' refusal of available gas was <u>not</u> caused by its prior loss of supply from the defendant.

"if no remedy or measure of damages is expressly provided herein or in a transaction"); *see id.* at Bates p. -346, § 3.2 (setting out the "Cover Standard" method of calculating liquidated damages for "breach of a Firm obligation to deliver . . . Gas"); *cf. El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 144–45 (Tex. 2012) (holding that although "replacement-power" damages sought by plaintiff were consequential damages, and although contract prohibited recovery of consequential damages, plaintiff could nevertheless recover replacement-power damages under the contract's "Cover Standard" provision because that provision contemplated recovery of replacement-power damages).

### B.  Conclusions of Law

The Contract provides for liquidated damages.  The parties elected the "Cover Standard" for calculating damages, which means that "if there is an unexcused failure to . . . deliver any quantity of Gas pursuant to this Contract, then [AOG] shall use commercially reasonable efforts to . . . obtain Gas . . . at a price reasonable for the delivery or production area, as applicable, consistent with: the amount of notice provided by [BP]; the immediacy of [AOG]'s Gas consumption needs . . . ; the quantities involved; and the anticipated length of failure by [BP]." *See* Def. Ex. 1, Bates p. -345, § 2.12.  The Contract also sets out a method for calculating damages under the Cover Standard, stating in relevant part:

> The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by [BP] on any Day(s), payment by [BP] to [AOG] in an amount equal to the positive difference, if any, between the purchase price paid by [AOG] utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by [BP] for such Day(s) excluding any quantity for which no replacement is available; . . . and (iii) in the event that [AOG] has used commercially reasonable efforts to replace the Gas . . . , and no such replacement or sale is available for all or any portion of the Contract Quantity of Gas, then in addition to (i) . . . above, as applicable, the sole and exclusive remedy of [AOG]

25

with respect to the Gas not replaced . . . shall be an amount equal to any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the quantity of such Gas not replaced . . . .

*Id.* at Bates p. -346, § 3.2.

Basically, then, subsection (i) compensates AOG for whatever extent to which it replaced BP's undelivered gas with gas purchased from third parties at prices greater than it would have paid BP under their Contract; while subsection (iii) compensates AOG for whatever amount of BP's undelivered gas it was unable to replace.  In algebraic form, the formula appears thus:

$$\{[(PP - CP) \text{ or } 0, \text{ whichever is greater}] \times (CQ - DQ - UQ)\}$$
$$+ \{[(SP - CP) \text{ or } 0, \text{ whichever is greater}] \times UQ\}$$

- *PP*: purchase price paid by AOG utilizing the Cover Standard
- *SP*: Spot Price
- *CP*: Contract Price
- *CQ*: Contract Quantity
- *DQ*: quantity actually delivered by BP
- *UQ*: quantity for which no replacement is available

The final task is to determine the values for each of these variables on each day, plug them in, and see what sum results.  That will be the amount of damages to which AOG is entitled under the Contract.

We begin with *PP*: the purchase price paid by AOG for replacement gas utilizing the Cover Standard.  The Court finds that AOG used commercially reasonable efforts to replace the gas that BP failed to deliver during Winter Storm Uri, but that these efforts were entirely unsuccessful.[15]

---

[15] At various earlier stages in this case, and in several March 2021 invoices sent to BP, AOG seemed to argue or imply that certain purchases of gas that it made under pre-existing swing contracts with a couple of marketers, called Spire Marketing, Inc. and Tenaska, constituted replacement gas.  *See* Pl. Exs. 16–17; *see also* Doc. 50, ¶¶ 10–19; Doc. 80-42, pp. 3–4 (internally numbered pp. 2–3).  However, AOG exercised its options under those contracts several days before it had any reason to expect that BP would fail to perform under its Contract with AOG.  *See* Doc. 79, ¶ 107; Doc. 95, ¶ 107.  No evidence introduced at trial supports the proposition that AOG's purchases from Spire and Tenaska were an attempt to replace BP's gas.

To this end, the Court credits the testimony of Mr. McCarter, who testified that although AOG attempted to purchase gas from many different marketers during the period from February 15 through 19, including Conoco-Phillips, NextEra, United Energy Trading, Southwest Energy and Shell, AOG was ultimately unable to procure any gas on the open market. *See* Doc. 116, pp. 148:15–150:24. In other words, AOG ultimately paid zero dollars and zero cents for replacement gas, which means that on each day the value of *PP* is 0. This has the lucky consequence of simplifying the damage calculations somewhat, as it means the total from the subsection (i) portion of the formula will necessarily be zero. That is because regardless of whatever values are assigned to *CP*, *CQ*, *DQ*, and *UQ*, it is necessarily true that 0 x (*CQ* – *DQ* – *UQ*) = 0.

Next, we must determine the value of *SP*: Spot Price, which the Contract defines in relevant part thus:

> "Spot Price" as referred to in Section 3.2 shall mean the price listed in the publication indicated on the Base Contract, under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day; provided, if there is no single price published for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average of such high and low prices. . . .

*See* Def. Ex. 1, Bates p. -346, § 2.31, *as amended by id.* at Bates p. -340. The parties indicated in the Base Contract that *S&P Global Platts Gas Daily* would be the publication, and that its daily "midpoint" index would be the price used in calculating the Spot Price. *See id.* at Bates p. -339. All of the Contract's Delivery Points are geographically located inside the "Enable Gas, East" area as defined by *Platts*. *See* Doc. 117, pp. 324:22–325:11. So determining the Spot Price for a given day is simply a matter of identifying the midpoint index price listed in the *Platts Gas Daily* for the Enable Gas East geographical area on the "relevant Day."

However, the parties disagree over what constitutes the "relevant Day" for purposes of calculating the Spot Price. Unhelpfully, the Contract does not define this term. Predictably, each

party favors a definition that is more advantageous to it than the other.  AOG contends that the "relevant Day" should be the day on which the gas at issue should have flowed.  BP contends that the "relevant Day" should be two days later than when the gas at issue should have flowed, because that is the date from which the Contract Price must be calculated according to the parties' Contract and Transaction Confirmation.  *See* Def. Ex. 1, Bates p. -345, § 2.10 (defining "Contract Price" with reference to the Transaction Confirmation); Def. Ex. 2, Bates p. -366 (providing that "[b]ecause this is a No-Notice service the Gas Daily Price used" for calculating the Contract Price "will be the GDD reported two business days following the actual flow date").  BP reasons that pegging the "relevant Day" for the Spot Price to the same date as the Contract Price will maintain consistency since the Contract Price is subtracted from the Spot Price.

Although at first blush BP's argument has some intuitive force, it falls apart upon closer examination.  In fact, consistency is best maintained by pegging the "relevant Day" to the actual flow date.  This is because, as one can see when looking at the formula in algebraic form as provided above, $SP$ essentially functions as a hypothetical proxy for $PP$.  In subsection (i) the Contract Price is subtracted from $PP$, while in subsection (iii) the Contract Price is subtracted from $SP$.  Put differently, while subsection (i) compensates AOG for whatever it actually overpaid for replacement gas on a given day, subsection (iii) compensates AOG for whatever it hypothetically *would have* overpaid for replacement gas on a given day if AOG had been able to obtain it.  And since the value of $PP$ would include whatever spot-market price AOG actually paid for replacement gas for a given flow date, consistency requires valuing $SP$ as the spot-market price that AOG *would have* paid for that same flow date—not two days later.  Therefore the Court finds that for purposes of calculating the Spot Price, the "relevant Day" is the date on which the gas at issue should have flowed.  Thus the Spot Price for each day at issue is:

28

- Feb. 15:  375.810
- Feb. 16:  375.810
- Feb. 17:  300.000
- Feb. 18:  428.640
- Feb. 19:   34.450

Def. Ex. 227, p. 1;[16] Def. Ex. 228, p. 1; Def. Ex. 229, p. 1; Def. Ex. 230, p. 1.

Next is *CP*: Contract Price.  As already mentioned, the Transaction Confirmation specifies that the Contract Price will be pegged to the *Gas Daily* index "reported two business days following the actual flow date."  *See* Def. Ex. 2, Bates p. -366.  It further provides that the formula to be used for calculating the Contract Price is to multiply the price listed for the East Texas NGPL Texok zone by 1.013, and then to add 0.03 to that.  *See id.* at Bates p. -365.  In other words, for any given day:

$$(\text{E. Tex. NGPL Texok 2 business days later}) \times 1.013 + 0.03 = CP$$

Thus the Contract Price for each day at issue is:

- Feb. 15:  24.125 x 1.013 + 0.03 = 24.469
- Feb. 16:  23.465 x 1.013 + 0.03 = 23.800
- Feb. 17:   6.700 x 1.013 + 0.03 =  6.817
- Feb. 18:   3.990 x 1.013 + 0.03 =  4.072
- Feb. 19:   2.660 x 1.013 + 0.03 =  2.725

Def. Ex. 228, p. 2; Def. Ex. 229, p. 2; Def. Ex. 230, p. 2; Def. Ex. 231, p. 2; Def. Ex. 232, p. 2.

Determining *CQ* (Contract Quantity) and *DQ* (quantity actually delivered by BP) for each day is a relatively straightforward task.  The Contract Quantity for each day is, of course, 30,000 MMBtu.  And the parties' separate internal calculations agree on the quantity actually delivered by BP on each day:

---

[16] Monday, February 15, 2021 was a federal holiday, so Friday, February 12 was the effective trade date for gas that flowed not only on February 13–15 but also on February 16, resulting in an identical midpoint index (and thus an identical *SP*) for both February 15 and February 16.  *See* Def. Ex. 227, p. 1.

- Feb. 15:  17,446 MMBtu
- Feb. 16:   8,203 MMBtu
- Feb. 17:        0 MMBtu
- Feb. 18:        0 MMBtu
- Feb. 19:   5,301 MMBtu

*Compare* Pl. Ex. 17 (March 29, 2021 AOG invoice to BP with attachment listing the quantity of gas for each day that BP failed to deliver) *with* Def. Ex. 80 (internal BP spreadsheet that lists, *inter alia*, "AOG Burn" for the relevant days).[17]

Now, to determine *UQ*: quantity of undelivered gas for which no replacement is available. Subtracting *DQ* from *CQ* yields a subtotal quantity of gas that BP failed to deliver on each day. Then, subtracting the undelivered gas from Merit and Wells Fargo that is excused by *force majeure* yields a final total of undelivered gas for which no replacement is available and for which BP is liable.  Thus:

|  | **Feb. 15** | **Feb. 16** | **Feb. 17** | **Feb. 18** | **Feb. 19** |
|---|---|---|---|---|---|
| *CQ* | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| *DQ* | 17,446 | 8,203 | 0 | 0 | 5,301 |
| Excused Merit | 8,850 | 12,000 | 12,000 | 12,000 | 12,000 |
| Excused Wells Fargo | 0 | 0 | 0 | 85 | 85 |
| *UQ* | 3,704 | 9,797 | 18,000 | 17,915 | 12,614 |

---

[17] Subtracting the undelivered quantities listed in Pl. Ex. 17 from the *CP* of 30,000 MMBtu for each day yields the quantities listed as "AOG Burn" in Def. Ex. 80.  Although BP argues that it should also get credit for "delivering" gas to PAL on February 17–19 that AOG did not use, the Court disagrees; AOG was prevented from using this gas by the service curtailment that BP's prior breach caused.  *See supra*, pp. 22–25.

Now we have everything we need to calculate damages.  As a reminder, this is the formula to be used:

$$\{[(PP - CP) \text{ or } 0, \text{ whichever is greater}] \text{ x } (CQ - DQ - UQ)\}$$
$$+ \{[(SP - CP) \text{ or } 0, \text{ whichever is greater}] \text{ x } UQ\}$$

- $PP$: purchase price paid by AOG utilizing the Cover Standard
- $SP$: Spot Price
- $CP$: Contract Price
- $CQ$: Contract Quantity
- $DQ$: quantity actually delivered by BP
- $UQ$: quantity for which no replacement is available

And these are the values assigned to each variable for each day:

|        | Feb. 15 | Feb. 16 | Feb. 17 | Feb. 18 | Feb. 19 |
|--------|---------|---------|---------|---------|---------|
| $PP$   | 0       | 0       | 0       | 0       | 0       |
| $SP$   | 375.810 | 375.810 | 300.000 | 428.640 | 34.450  |
| $CP$   | 24.469  | 23.800  | 6.817   | 4.072   | 2.725   |
| $CQ$   | 30,000  | 30,000  | 30,000  | 30,000  | 30,000  |
| $DQ$   | 17,446  | 8,203   | 0       | 0       | 5,301   |
| $UQ$   | 3,704   | 9,797   | 18,000  | 17,915  | 12,614  |

Plugging these values into the formula yields the following totals for each day:

- Feb. 15:  $1,301,367.06
- Feb. 16:  $3,448,641.97
- Feb. 17:  $5,277,294.00
- Feb. 18:  $7,606,135.72
- Feb. 19:    $400,179.15

The sum of these numbers is $18,033,617.90 in damages which AOG is entitled to recover from BP under the Contract.

31

**IV.     Conclusion**

IT IS THEREFORE ORDERED that Plaintiff Arkansas Oklahoma Gas Corporation shall have and recover from Defendant BP Energy Company $18,033,617.90 in damages on its claim for breach of contract.  Judgment will be entered separately.

IT IS SO ORDERED on this 24th day of May, 2023.

/s/ P. K. Holmes, III

P.K. HOLMES, III
U.S. DISTRICT JUDGE